MISSISSIPPI COMPRESS AND WAREHOUSE COMPANY ET AL. v.
CHARLES LEVY ET AL.

TWO CASES.

1. EQUITY. Relief. Adequacy of legal remedy. Privity.

Where a railroad company and a cotton compress company, for their own convenience, made an agreement whereby the railroad company, instead of delivering cotton to the consignee, would deliver it to the compress company, and turn over to the consignee compress tickets calling, not for specific bales, but for an equal number of bales of average weight and quality:

(a) There is such a privity between the two companies as entitles a consignee to equitable relief against both of them for the loss of cotton shipped; and

(b) Where there was a shortage in shipment, the consignee's remedy at law, if any, is so inadequate as to entitle him to relief in equity against both companies.

2. SAME. Uncertainty. Discovery.

Where a consignee has no means of knowing whether a railroad company or a compress company has possession of his cotton, each claiming the other to be liable for it, he may, if the uncertainty were produced by their joint action, sue in equity, demanding discovery from each and recovery from either or both as the facts, when discovered, may justify.

FROM the chancery court of, first district, Hinds county.

HON. ROBERT B. MAYES, Judge.

Levy and others, doing business under the firm name of M. Levy & Co., appellees, were complainants in the court below in both cases. The Compress Company and the Alabama & Vicksburg Railway Company, appellants, were defendants in one of the suits, and the Compress Company, and the Yazoo & Mississippi Valley Railroad Company, appellants, were defendants in the other suit.

The amended bills of complaint were substantially the same in both cases; that one to which the Alabama & Vicksburg Rail-

way Company was a defendant shows that there was an endorsement on the bill of lading to the effect that the cotton was shipped to the care of the Compress Company, and the bill charged that the indorsement was not meant by the parties to authorize the railway company to deliver the cotton to the compress company, and was not intended to constitute the compress company the agent of the consignee to receive it; one of the amended bills, that in the case in which the Yazoo & Mississippi Valley Railroad Company was defendant, is set out in full, by order of the court, and, omitting formal parts, is as follows:

"In the fall of 1900 complainants were, and still are, cotton buyers and factors in New Orleans, La. D. W. Reed was their agent at Jackson, Miss., buying cotton for them in that vicinity. The defendant, the Yazoo & Mississippi Valley Railroad Co. at that time, as well as now, had a station in Jackson, and the compress, warehouse, and yards of the defendant, the Mississippi Cotton Compress & Warehouse Co., were situated near the station of said railroad, and a spur track of said railroad ran into the ground and yard of the compress company. It was the mutual interest of the defendants to have uncompressed cotton brought from stations on said line of railroad to Jackson for compressing and shipment. Complainants, through their agent, bought cotton in towns continguous to Jackson, including towns and villages along the line of said railroad, and such cotton, when bought, was shipped into Jackson to be compressed. It was the custom obtaining between the said railroad company and the compress company and the various cotton buyers in Jackson for the railroad company to make delivery of cotton in Jackson through the compress only. To be more specific, the custom was as follows: On the purchase of cotton at a town on defendant's railroad by complainants or other cotton brokers in Jackson, it was shipped by the seller, consigned either direct to the broker in Jackson or to their own order, with directions

to notify the broker, and these bills of lading were sent to the
cotton buyer in Jackson upon delivery of the cotton to the rail-
road at the initial point. As the cotton arrived in Jackson the
cars containing it were run into the compress, and the cotton
was there unloaded by the railroad company, and the compress
tickets for the bales of cotton so delivered were issued and de-
livered by the compress company to the railroad company.
Upon presentation by the consignee of the bill of lading to the
railroad company at Jackson, the company made delivery, not
of the actual cotton, but of the compress tickets. These tickets
specified the number and weight of the bales, and were meant
to, and did in fact pass by delivery. Since the cotton buyer
also intended to have the cotton compressed, he acquiesced in
this arrangement by the railroad company in order to save a
double handling of the cotton in Jackson. Thus the compress
company was made the agent of the railroad company for mak-
ing delivery of the cotton to the consignee. During the con-
tinuance of the above course of business complainants' agent,
Reed, bought cotton for complainants along the line of defend-
ant's road during the entire season, beginning September 1,
1900. The defendant railroad company thus received for ship-
ment, consigned to D. W. Reed, at Jackson, Mississippi, various
consignments of cotton, as follows: October 9, 1900, one bale;
on October 25, 1900, twenty-eight bales; on October 27, 1900,
fifteen bales; on November 15, 1900, seventeen bales; on De-
cember 10, 1900, three bales; on December 17, 1900, one bale;
on December 20, 1900, eleven bales. Of the foregoing ship-
ments the company failed to make delivery of the following
bales of cotton: One bale shipped October 9, marked F. K. 327;
one bale shipped October 25th, marked F. K. 185; ten bales
shipped October 27th, marked S. & M. 39, 40, 41, 42, 43, 44,
45, 46, 47, 48; one bale shipped November 15th, marked W. F.
125; three bales shipped December 10th, marked J. 136, 137,
138; one bale shipped December 17th, marked C. P. H.; one
bale shipped December 20th, marked (P.) 362. In addition

to these, there was one bale, the mark and description of which were in the manner hereinafter indicated. When these several shipments were due to arrive, and as they began to arrive, in each instance complainant's agent, Reed, presented the bill of lading and demanded the compress tickets therefor; but, owing to the shortage on each of said shipments as above indicated, the bales of cotton above described not having arrived, Reed did not surrender to the company the bills of lading, holding the same against the shipments that were short. By agreement of the agent of the railroad company, where parts of the several shipments did arrive, and compress tickets were procured and delivered therefor, the fact was noted on the bill of lading, by consent kept by Reed to await the cotton not yet arrived. Complainants aver and charge that said cotton has never been delivered, and that it is now either in the possession of the railroad company or the compress company, or has been converted by them to their own use. The weight of said nineteen bales of cotton was 9,500 pounds, and its value at the time it should have been delivered was nine cents per pound, or, in the aggregate, $855.

"Complainants are advised that defendants claim that all or quite a number of the specific bales of cotton called for by the bills of lading, and which were short, were afterwards delivered to complainants, or came into complainants' possession. Complainants deny this, but, if mistaken in this, and if the specific bales were ever delivered, they were delivered under another course of dealing, which complainants will now detail: When the above course of dealing between the shippers, the railroad company and the compress company and the consignees was adopted, which was prior to any of the dealings herein mentioned, it was contemplated by the railroad company and the compress company that bills of lading showed the marks of the cotton, and the compress tickets did also; that no cotton should ever be delivered upon any bill, and in exchange therefor, except the particular bale described therein. Owing to the

great confusion which arose, as complainants believe, because of the insufficient force at the railroad offices and at the compress, this course was abandoned prior to the dealings herein mentioned, and any bale in the possession of the compress bearing the letter mark called for by the bill of lading, which mark denoted the consignor, was delivered for a like number of bales called for by the bill of lading, regardless of the particular number. To illustrate: If F. J. Kelly, of Carlisle, Mississippi, sold Reed, agent, one hundred bales of cotton, each marked F. K., and bearing numbers from one to one hundred, and if the one hundred bales should come in separate shipments with separate bills of lading, any bill of lading calling for a certain number of bales so marked would be taken up and exchanged for any like number of bales bearing the same mark, regardless of whether the numbers corresponded or not. As all parties acted on the assumption that in due course all the shipment would be received, and as usually all the shipment was received, this plan caused no loss and little trouble to any of the parties; but, as can readily be seen, when some of the bales of cotton never arrived, and bills of lading for portions of the shipment had been delivered without regard to the numbers, it might and did result that the consignee would be left with a bill of lading which properly called for a certain number of bales actually short, while the specific numbers called for therein had actually been received, but received in exchange for and in satisfaction of a different bill of lading for a like number of bales. This course of delivery without regard to numbers, and having only regard to marks, was pursued during the entire cotton season, beginning September 1, 1900, and ending September 1, 1901; and it was well understood between all the parties that if, as a result of this method of delivery, there should be any shortage at the end of the season, the railroad company and the compress company should be answerable for the value of the number of bales so short, and that they would not claim that the actual delivery of bales bearing certain marks was a satisfaction of an

outstanding bill of lading which showed on its face such number. In other words, to use the phrase current among the parties, a ticket was a bale, provided the letter marks were the same. Therefore complainants aver that if it be true, as defendants claim, that those bales of cotton were delivered, yet they were delivered and received with the distinct understanding that they were in exchange for other bills of lading, calling for a like number of bales, and that these bills of lading which have never yet been surrendered should represent and be good for the number of bales of cotton called for by them, treating each bale as an average bale, to wit, five hundred pounds, and of middling quality, the value of which was nine cents per pound, or $855 in the aggregate. After the said cotton season was over, and after complainants' agent, Reed, had, with the defendant's agent, also vainly tried to find said cotton, and when it was believed that the said cotton had miscarried in some unknown way, Reed turned over said bills of lading to T. J. Savage, agent for the said railroad company at Jackson, and received from him a receipt as follows: 'Jackson, Miss., May 6. 1901. Received of D. W. Reed, B-L covering 19 b|c from Y. & M. V. Said B.|L. attached to claim No. 275. J. T. Savage.' The bills of lading were also turned over to the defendant company in order to aid them in tracing the cotton, and while in the possession of the defendant some one of its clerks made certain notations on each of them relating to the delivery of the cotton. These memoranda are not part of the bills of lading, and are improperly noted on them, and are not evidence, since they were placed there without authority by some one after presentation and pending examination of the claim for shortage. Complainants are not advised and have no means of ascertaining whether or not said bales of cotton were delivered to the compress company, and whether they were lost through its fault or through the fault of the railroad company, but private books kept by each of the companies ought to show and will show which of the companies is primarily liable for

the loss. Even if it be true that the specific bales of cotton were delivered in exchange, yet it still remains true that the shortage for the like amounts still existed, and has been continued throughout until now; and it is impossible that such shortage could apply or represent a shipment over any other line of railroad leading into the compress, since delivery was made according to marks, or on each of the bills of lading now in complainants' possession are marks, showing consignors and purchases along the line of defendant railroad, and no delivery could have been made, or could have been accepted, or ever was made, except cotton which came over the same railroad, and which bore the same marks of the various shippers, always kept separate by complainants. The defendant railroad company declines to pay for this cotton short, because it claims that it had made delivery to the compress company. The compress company, on the other hand, denies liability, claiming that the specific bales of cotton shown by the bills of lading have been delivered. Complainants are informed, believe and aver that at the end of the cotton season of 1900-1901 there were a number of bales of cotton 'over'—that is, cotton undelivered—and these were more in number than those called for by complainants' bills of lading. If this be true, such cotton belongs to these complainants. They are, however, without knowledge or means of definite information as to this, and therefore they are entitled to discovery from the compress company as to what cotton was in their compress at the close of the business season as 'over,' and to have the same, or the value of the same, applied to the satisfaction of their claim as above stated. However, complainants say that, whether there were any 'overs' or not, defendants are jointly liable if the total number of bales of cotton containing any of the marks noted on the bills of lading were delivered to the compress company, since the compress company was the agent of the railroad company for making

delivery. Complainants file herewith the said original bills of lading as parts hereof.

"Premises considered, complainants pray that subpœnas issue for the defendants, returnable to the October term of court; that defendants make answer, but not under oath, and discover the whereabouts of the cotton called for by the bills of lading, and yet short, and, if delivered to the compress, that the compress make discovery as to what disposition it made of them, and, if any cotton was left over, as to whether or not it represented the shortage called for by these bills of lading, and, in any event, that defendants be held liable to complainants for the value of the said nineteen bales of cotton at the time it should have been delivered."

The defendants respectively demurred to the bills of complaint, their demurrers were overruled, and they appealed therefrom to the supreme court.

*Green & Green,* for appellant, Mississippi Cotton Compress & Warehouse Company.

The appellees cannot make a number of persons parties defendant, aver that one of them is guilty of a conversion, but which one they do not know, and pray that the several parties defendant interplead each with the other for appellants' benefit. *Bank* v. *Phillips,* 71 Miss., 51.

There is absolutely no averment that the cotton ever got to Jackson, or that this appellant was in the slightest interested therein. *George* v. *Solomon,* 71 Miss., 171.

There is nothing in the decisions of this court in *Gay* v. *Edwards,* 30 Miss., 218; *Tate* v. *DeSoto,* 51 Ib., 588; *State* v. *Brown,* 58 Ib., 835; *Lauderdale County* v. *Alford,* 65 Ib., 63, that lends the slightest support to the present proceeding.

*Gay* v. *Edwards* was rested upon the facts that the fund sought to be distributed was a trust fund, that the complainants had no remedy at law, and, finally, that the rights of the respective parties could be determined only upon the statement

of an account to which statement all the claimants were necessary parties. The other cases were such that the liability of the respective defendants could only be determined by an accounting in which all were interested.

Appellee's pretended joint traffic arrangement does not help them, because they do not show that the cotton sued for ever came within its operation, in short no averment that this cotton ever got to Jackson, and until then it would not come within the alleged "joint traffic arrangement."

The case of *Lauderdale County* v. *Alford,* 65 Miss., 63, as to the point alleged to be here under consideration, contains nothing but *dictum,* because all the facts were known and there was no need of discovery.

The bill is also fatally defective within *Illinois, etc., R. R. Co.* v. *Gross,* 22 So. Rep. (Miss.), 946.

Upon close analysis this suit is nothing more nor less than an attempt to recover a general balance, without giving specifics, is for a general shortage upon the whole season's business, and as such falls clearly within the condemnation of the *Gross case.*

*McWillie & Thompson,* for appellant, Alabama & Vicksburg Railway Company.

The course of business mentioned in the amended bill is one with respect to which the shipment was made by the shipper, and with which Reed was perfectly familiar at the time he ordered the cotton shipped. This course of business does not, nor could it, make the railway company and the compress company partners. The bill does not aver that they were partners. In fact, they could not, under our anti-trust laws, become partners. When Reed, therefore, ordered his cotton shipped in the way in which he did order it shipped, and in the way in which McClanahan & Company shipped it, the contemplation of the parties was that the railway company would deliver the

cotton to the compress company, and since the bill does not negative the idea of the railway company having done so, but proceeds upon the idea that it did so, it does not present a case against the railway company.

The legal effect of the course of business set up in the amended bill was to authorize the railway company to deliver the cotton to the compress company without reference to the endorsement on the bill of lading. Thus, in *Ontario Bank* v. *Steamboat Company,* 59 N. Y., 510, it was held that evidence of previous deliveries to one who was neither the consignee nor entitled to the delivery by the terms of the bill of lading, or by its assignment, with the knowledge of the owner of the goods, and without any objection having been made by him, justified such a delivery. In the case cited, the goods were shipped to New York to the order of the bank, the plaintiff, and were delivered by the carrier without the order of the bank to a person to whom a number of previous similar shipments had been delivered with its knowledge, and without any objection by it, the delivery was held to be justified by the previous course of dealings, the carrier having a right to presume that the party to whom the delivery was made was the agent of the bank, delivery to an agent being equivalent to a delivery to the order.

Bear in mind the amended bill nowhere negatives the idea, but on the contrary proceeds upon the idea that the railway company did deliver the cotton to the compress company, and bear in mind, too, that the course of business mentioned in the amended bill was known to complainants and to Reed at the time they ordered McClannahan & Company to make the shipment. 4 Elliott on Railroad, 1522, and notes.

Where it is the custom of railroads carrying grain to deliver it on behalf of the consignees to public warehouses or elevators, and where the elevator company does not give the consignee a receipt until the railroad freight bills have been paid, a delivery of the grain to such elevator company is sufficient to terminate

the liability of the railroad company as a common carrier, though the grain be destroyed in the elevator before such receipt has been given. *Arthur* v. *St. Paul & D. R. Co.*, 38 Minn., 95; s.c., 35 N. W. Rep., 718; s.c., 32 Am. & Eng. R. Cases, 449.

The bill tells us that in executing the instrument given Reed, the compress company was acting for itself and as agent of the Alabama & Vicksburg Railway Company, but it does not tell us that the company was *in truth the agent of the railway company,* or that it had authority to act for the railway company. Where a person is sued for the acts of his agent, it is essential to aver, in order to make out a case against the principal, that the person who assumed to act as his agent was in truth his agent. The pleadings carry the question away from agency, from the authority of the principal, and lead us into an inquiry as to what the supposed agent was assuming.

The instrument quoted in the bill against our client is a distinct recognition by Reed and his principals, the complainants, of the liability of the compress company, and of the fact that the compress company had received the cotton. An agency for the railway company cannot be established by a mere declaration that the compress company acted as its agent.

The bill is a fishing bill in the double sense:

1st. It is uncertain as to what bales of cotton the suit is for, whether for the five bales shipped by McClannahan & Company, as first stated in the bill, or of other cotton. This other cotton is not shown to have been shipped over the Alabama & Vicksburg Railway.

2d. The bill proceeds upon the idea that one of the parties, or the other, is liable to complainant, and in this aspect the bill is not good as against either of the defendants.

It has been decided by this court that a bill against two parties, claiming that one or the other is liable, is not maintainable. *Bank* v. *Phillips,* 71 Miss., 51.

That goods shipped in care of a person may be properly delivered to that person is undisputed in the books. There is

some contention where the person to whose care the goods are shipped is the carrier's agent, but none under such circumstances as are involved in this suit. 5 Am. & Eng. Enc. Law (2d ed.), 198; *Taylor* v. *Grand Trunk R. Co.*, 24 U. C. C. P., 582; *Mobile, etc., R. Co.* v. *Pruett*, 46 Ala., 63; *Russell* v. *Livingston*, 16 N. Y., 346; *Bristol* v. *Rensellaer, etc., R. Co.*, 9 Barb., 158; *Bennett* v. *Northern Pac. R. Co.*, 12 Oregon, 49; *United States Express Co.* v. *Rush*, 24 Ind., —; *Savanna, etc., R. Co.* v. *Collins*, 77 Ga., 376, s.c., 4 Am. St. Rep., 87; *Ela* v. *American Merchants Union Express Co.*, 29 Wis., 611; s. c., 9 Am. Rep., 619; *Chicago, etc., R. Co.* v. *Merrill*, 48 Ill., 425.

*Mayes & Longstreet*, for appellee, Yazoo & Mississippi Valley Railroad Company.

The question raised by the appeal in this case is simply this: Whether the complainant can lodge jurisdiction in the chancery court simply because he is ignorant whether the liability to him, supposing that a liability exists at all, is against the railroad company on the one hand, or the compress company on the other. We adopt the brief of Messrs. Green & Green, filed in behalf of the compress company.

It is manifest that if the bill wants equity as against the compress company, it also wants equity as to the railroad company. The same reason applies as to each defendant.

*Alexander & Alexander*, for appellants.

The main ground of demurrer is want of jurisdiction in equity because the remedy at law is inadequate. Section 147 of the constitution prevents a reversal on this ground.

The action of the court in overruling the demurrer was clearly right. We rest the jurisdiction of the court on the ground that the remedy at law is inadequate; on the right of discovery, and on the ground that by the conjoint action of the defendants the facts as to which of successive bailees, in privity with each other, is liable has been rendered uncertain. The latter ground

is included within the first, being a branch of the general power of courts of equity to compel discovery.

As to the liability of the warehouse company, we confess our inability to see how there can be any difference of opinion. Not only is it liable on the averments of the bill, but it is liable in equity. If there were no other facts set out in the bill but those pertaining to the execution of its due bill and contract, that company would certainly be liable. After itself creating the confusion which ensued as to the whereabouts of this cotton it gave to Reed, appellee's agent, the following receipt:

"Jackson, Miss., October 3, 1899. There is due D. W. Reed compress receipt for 7 b. c. as per attached expense bill, pro 14,534, unless our check of books show same to be already issued. Mississippi Compress & Warehouse Company, by Chas. Zeigler."

The purport of this agreement is explained by the bill. For the mutual convenience of the cotton buyers, the railroad company, and the compress, all parties ignored the numbers of particular bales of cotton. In the vernacular of the streets a bale was a bale. Each receipt stood for a bale instead of the particular bale numbered on it. Reed had in his possession a bill of lading covering quite a number of bales of cotton shipped to him. In due course of business the railroad company made delivery to its agent, the warehouse company, and the railroad company would take up the outstanding bills of lading or consignee with warehouse tickets or receipts. Of course the railroad company treated itself as responsible until the surrender of the bills of lading. It has no other place to make delivery of cotton except at the compress warehouse, and when cotton was shipped "care of compress," as the bill avers, it did not mean that the compress company was the agent of the shipper, and received the cotton for the shipper. It only indicated that the cotton was to be stopped here for compressment instead of going on through.

The compress company is liable on its receipt and contract, especially since in view of the averments of the bill it declined to make the very discovery it promised.

But the bill is maintainable against the defendants jointly. It is not a case where a plaintiff has a cause of action against somebody, and proceeds to sue several defendants having no privity with each other, in order, by the process of elimination, to arrive at the one liable. It is a case of three parties standing in privity to each other, two of them public carriers which have assumed an obligation to plaintiff touching the same subject-matter. These defendants are in privity to each other. They were mutually interested in making the traffic arrangement by which delivery should be made only to the compress company. They made a mutual arrangement by which the railroad company used compress tickets in taking up bills of lading. They made another mutual arrangement by which to save themselves trouble. By agreement with cotton buyers they ignored the numbers of bills of lading and warehouse receipts, and treated every ticket or bill of lading for a bale as representing any bale, instead of the particular bale called for. In this particular case they made a mutual arrangement by which the railroad company took up the bill of lading and gave an expense bill, assuring Reed that the warehouse company would honor it by delivering tickets. *Bank* v. *Phillips,* 71 Miss., 51. *George* v. *Solomon,* 71 Miss., 171, has no sort of application.

We fully recognize the rule laid down in *Garland* v. *Hull,* 13 Smed. & M., 76, and in numerous subsequent cases, that a bill is not maintainable unless upon a *pro confesso* there could be a decree. But this does not mean that there might be a final decree settling all the rights of the parties. If this were true, the bills of discovery could never give any relief where there was a *pro confesso.* If there had been a *pro confesso* in this case we would have been entitled to a decree compelling discovery and an accounting. Where the facts alleged entitle to an accounting, or to a discovery, or where by the action of de-

fendants the facts are made uncertain, the arm of equity is not shortened that it cannot save, merely because the defendant's make no defense.

The bill is good under the principles announced in *Gay* v. *Edwards,* 30 Miss., 218. In *Tate County et al.* v. *DeSoto County,* 51 Miss., 588, the same principle is announced. *Supervisors* v. *Alford,* 65 Miss., 64, contains a distinct recognition of the rule we contend for.

On another principle the defendants are properly joined in this bill for recovery. It is alleged, and the facts set out show, that the compress company is really the agent of the railroad company, and in suits for discovery against corporations, an agent who is charged with delinquency may be joined as defendant. This is an exception to the general rule as to the joinder of agents in bills of discovery against the principal. 1 Pomeroy Eq., sec. 199, but it must be borne in mind in this case that this agent has, by giving a contract, expressly assumed a duty to check up its books and make the very discovery we are here praying for.

We think this bill also maintainable as a bill not of interpleader strictly, but as a bill in the nature of a bill of interpleader, which under all the authorities on chancery pleading and practice can be filed even though complainant is not a mere stakeholder, but seeks an affirmative relief.

Argued orally by *Garner W. Green* and *Marcellus Green,* for appellant, Mississippi Compress & Warehouse Company, and by *C. H. Alexander,* for appellees.

WHITFIELD, C. J., delivered the opinion of the court.

The reporter will set out the bill of complaint in full, in order to a clear comprehension of our opinion. Without special reference in this opinion to the particular allegations of the bill, we summarize by saying that the gravamen of the bill is as follows: That the railroad company and the compress com-

pany, for their mutual convenience, entered into a joint traffic arrangement whereby cotton shipped from different points along the line of railway to Jackson for compression, before being shipped through to its destination, should be delivered into the compress yards, the railroad company having no place wherein cotton could be delivered. Upon the cotton being so delivered, the compress company would issue to the railroad company compress tickets, which tickets stood not for any special bales, by marks and numbers, but for any bales of average weight and quality; and the railroad company so receiving such compress tickets would, when the consignee came with his bill of lading, demanding his cotton, deliver to him no actual cotton at all, nor the particular bales called for by marks and numbers in the bill of lading, but only the aforesaid compress tickets. This suit is for a certain number of bales short on the season's dealing. The bill avers what has been stated with great clearness and particularity, and then proceeds to charge that the cotton short is due complainants by the defendants—the railroad primarily, and the compress company perhaps secondarily —and that the complainant is wholly ignorant of how the shortage occurred; that the respondents both knew all about it; and that their books would show, as between themselves; and discovery is prayed of the facts in the case touching the delivery of this cotton, so that the liability may be placed where it belongs. The uncertainty and confusion as to which one of the defendants is liable is averred by the bill to be directly chargeable to the respondents, as the result of their joint traffic arrangement, and the conduct of each under and in pursuance of the same. The bill charges further, in the case in which the Alabama & Vicksburg Railway Company is defendant, that the compress company actually executed a receipt acknowledging its liability for the cotton in that suit embraced, provided only it should turn out, on the checking over of its books, that the compress had got the cotton during the season. This was a clear acknowledgment of the duty of the compress company

to make the investigation, furnish the discovery, and settle, or not, accordingly. This is the only distinguishing difference between the allegations in the two bills. Both bills charge, in effect, that these respondents engaged in a battledoor and shuttlecock performance as to their liability; each claiming that the other was responsible, and each denying its own liability. There were demurrers to the original bills, which were sustained, and amended bills were filed, and the demurrers to these amended bills were overruled, and from this decree these appeals were prosecuted.

The jurisdiction of the chancery court is put, in these bills, upon the necessity for discovery, the embarrassed and inadequate nature of the remedy at law, and upon the further distinctive ground that these respondents, having, for their own mutual convenience, changed the ordinary rule as to delivery under the bills of lading calling for specific bales by marks and numbers, by having entered into the aforesaid traffic arrangement, have brought about a status, as between themselves and shippers of cotton, wherein there clearly exists, as between themselves, a privity which renders them liable to such shippers. Are the bills maintainable? *Bank* v. *Phillips,* 71 Miss., 51, 15 So. Rep., 29, is entirely inapplicable here. There was no privity whatever between the defendants in that case. That was a fishing bill, pure and simple. *George* v. *Solomon,* 71 Miss., 168, 14 So. Rep., 531, is also inapplicable. In that case the defendants were not only not in privity, but stood in distinctly antagonistic relations to each other as to the liability involved. In *Supervisors* v. *Alford,* 65 Miss., 69, 3 So. Rep., 247, 7 Am. St. Rep., 637, Campbell, J., said: "Had the bill been so drawn as to show that the facts are unknown as to which set of sureties are liable, the jurisdiction of chancery would have been undoubted." Citing *Gay* v. *Edwards,* 30 Miss., 218; *Tate* v. *DeSota,* 51 Miss., 588. That was a suit in equity to establish liability between two sets of sureties on an official bond of Alford as treasurer of Lauderdale county. There was no priv-

ity between those two sets of sureties, and this is a stronger case than that in that respect. In other words, that case rested simply upon the confusion as to which set of sureties could be held liable, and the necessity for an accounting to so ascertain; and what the court held was that those two facts would give jurisdiction, but that the bill in that case not having averred ignorance as to which set of sureties was liable, but, on the contrary, expressly showing where the liability ought to have been placed, jurisdiction on those particular grounds was not shown in that case. In these cases the bills not only aver this very want of knowledge as to which of these two defendants is liable, and not only pray for a discovery to be made by them of the facts peculiarly within their knowledge, which would disclose which was liable, but they aver a state of facts from which it is clear that these defendants are not to be charged as occupying a distinct and independent attitude towards each other, but as strictly in privity one with the other, so far as the delivery of this cotton is concerned, as to the liability to complainant. The bills present a clearer and stronger case for the interposition of equity than was the Alford case or the case of *Gay* v. *Edwards, supra.* In *State* v. *Brown*, 58 Miss., 840, the court quoted this expression from the case of *Gay* v. *Edwards* with approval: "There might have been circumstances under which Wynne alone might not have been liable for the money placed in the hands of Gay, and Gay was certainly not liable for more than he received. It was necessary for the complainant to go into equity for a discovery of the amount of the fund due from Wynne, and for an account and distribution." And the court well observed: "It is not true that equity has no jurisdiction of a cause because there is a remedy at law. If the remedy is inadequate to afford full and effectual relief, equity will afford relief, though the complainant might have sued at law." In *Tate County* v. *DeSoto County*, 51 Miss., 588, this court said: "When several parties are interested in the account

to be taken, to prevent a multiplicity of suits, resort may be had to a court of equity. 1 Story Eq., ch. 8, sec. 446, *et seq."*

We uphold the right to equitable relief in these cases upon these grounds: First and specially. That the allegations of these bills make a case of clear privity between these defendants. They are not to be treated and dealt with separately and independently of each other, but they are to respond from the basis of privity which they have established for themselves by their joint traffic arrangement. If they chose to change the original rule as to place and mode of delivery of specific bales by marks and numbers, so that the railroad company could not deliver cotton at all to the holder of the bill of lading, but only to the compress company, receiving from the compress company and delivering to the holder of the bill of lading compress tickets calling, not for the specific bales called for by the bill of lading, but for an equal number of bales of average weight and quality, and to do all this simply for their own mutual convenience and profit, they have established thereby, as between themselves, a privity which they will not be allowed to repudiate when called on by holders of bills of lading to respond. Second. The equitable right to discovery is another ground for the jurisdiction, especially in view of the fact that the whole confusion and uncertainty as to liability was brought about by the joint action of these defendants. Third. If there was a remedy at law, it is clearly an embarrassed and inadequate one.

Wherefore the decrees in both cases are affirmed, and the causes remanded, with leave to answer within sixty days after the filing of the mandate in the court below.

*Affirmed.*